RAYMOND GREENBERG AND MARILYN GREENBERG, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 176–71.   Filed June 18, 1974.

*Werner Strupp*, for the petitioners.
*Thomas C. Morrison* and *Howard L. Williams*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes of $92,555.15 and $11,462.60 for the taxable years ending December 31, 1966 and 1967, respectively. Some of the issues have been disposed of by the parties, leaving for decision whether petitioner's multiple real estate corporations were shams for tax purposes so that $213,994.53 received upon the purported "liquidation" of four of the five corporations is a distribution to petitioner from the surviving corporation in the nature of a dividend taxable as ordinary income to him.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. Petitioners Marilyn and Raymond Greenberg are husband and wife and resided in Bethesda, Md., at the time their petition in this case was filed. They filed their joint Federal income tax returns for the

calendar years 1966 and 1967 with the district director of internal revenue at Baltimore, Md.

Raymond Greenberg (hereinafter sometimes referred to as petitioner) is in the real estate development business and had been in that business for a number of years prior to the years here at issue. Prior to 1966 he joined with Simon Sherman (hereinafter Sherman) to form Colt Construction Co. partnership for the purpose of constructing about 10 houses in an area called Colt Terrace in Wheaton, Md. After this project had been completed, petitioner, Sherman, and George Revitz (hereinafter Revitz) decided to develop large residential subdivisions. With the advice and assistance of their accountant, in December 1958 they formed Gerasi Partnership (hereinafter Gerasi), each of them being an equal partner. They also formed five corporations, the names and dates of incorporation of each entity being as follows:

| Name [1] | Total capital contribution | Total shares issued | Date incorporated |
|---|---|---|---|
| Colt Development, Inc. (Development) | $3,000 | 1,500 | 2/3/59 |
| Colt Builders, Inc. (Builders) | 3,000 | 1,500 | 5/21/59 |
| Colt Homes, Inc. (Homes) | 3,000 | 1,500 | 6/2/59 |
| Colt Properties, Inc. (Properties) | 3,000 | 1,500 | 2/15/60 |
| Colt Contractors, Inc. (Contractors) | 3,000 | 1,500 | 2/29/60 |

[1] The five corporations will hereinafter be referred to collectively as Colt corporations or Colt entities.

Petitioner, Sherman, and Revitz each contributed $1,000 and received 500 shares of no par common stock of each corporation. At all times each Colt corporation had only one class of stock.

Gerasi and the five Colt corporations were engaged in the development, construction, and sale of single-family houses in two areas, Burnt Mills Park and Foxhall, both areas being located in Montgomery County, Md. Gerasi acquired construction equipment which it rented to the five Colt corporations.

The articles of incorporation of each of the Colt corporations contained similar provisions for each one's incorporation under the laws of Maryland, corporate powers, and original directors (Sherman, Greenberg, and Revitz). These articles set forth in identical clauses each corporation's limitations and regulations, and designated the same principal office and registered agent. The bylaws of each corporation were essentially the same, with the exception of different prescribed days and times for stockholders and directors meetings. Each corporation's minute books recorded similar resolutions regarding officers' compensation, a bank account with Suburban Trust

Co., and, in the case of Builders, Contractors, Homes, and Properties, liquidation of the corporation.

The development and sale of the first Colt subdivision known as Burnt Mills Park was carried out in the following manner: Gerasi purchased the first tract of land consisting of 60 lots and simultaneously transferred the land at cost to Development on March 23, 1959, before any of the other Colt corporations had been formed. Development retained 24 lots, conveyed 15 lots to Builders in June 1959, 20 lots to Homes in September 1959, and 1 lot to Homes in March 1960. Gerasi purchased a second Burnt Mills Park tract in February 1960 consisting of 50 lots from which it transferred at cost 20 lots to Properties and 17 lots to Contractors, both of which had been recently created, and 12 lots to Development over the remainder of 1960 and 1961. A 13th lot was transferred to Development in 1963.

Sometime in 1960 Gerasi purchased lots in the Foxhall subdivision and in a manner similar to that used for lots purchased in Burnt Mills Park distributed most of these during 1961 through 1967 to the various Colt corporations, transferring a total of 76 lots to Development, 46 lots to Builders, 58 lots to Homes, 57 lots to Properties, and 52 lots to Contractors. Payments for lots were treated as open account indebtednesses between Gerasi or Development and the appropriate corporation, that is, as an account payable by the Colt corporation and an account receivable by Gerasi or Development. The Colt corporations took the lots subject to purchase-money obligations executed by Gerasi to the sellers. As each lot was sold, the Colt corporation holding title paid the original sellers the necessary amount to release the underlying purchase-money lien.

The subdivision plan for Burnt Mills Park had already received approval of the appropriate Government authority and was formally dedicated prior to Gerasi's purchase. With respect to Foxhall, Gerasi formally dedicated all plats of the subdivision.

With regard to both Burnt Mills Park and Foxhall, Gerasi and/or Development obtained the necessary permits for grading streets and roadways. Development furnished subdivision bonds and conducted various transactions with the Montgomery County Department of Public Works and the Washington Suburban Sanitary Commission regarding storm drains and sewers on behalf of the entire subdivision.

Development was billed and paid for the extensive engineering work necessary to prepare both development sites for subdivision and construction of houses. These expenses included:

Boundary survey, topographic surveys, tentative subdivision plan, street grade and profile design, street grade stakeout, street grade permit application, record

plats, petition preliminary stakeout and compliance with authority for sewer and water, stakeout property points for construction of sewer and water, storm drain study, storm drain design and paving plan, storm drain stakeout, paving stakeout, permit applications, development plans, lot stakeouts, house stakeouts, first floor grades, wall check surveys, final house location surveys.

All project costs including rental of construction equipment from Gerasi were billed to and paid for directly by Development. At the end of each Colt corporation's fiscal year, Development allocated to it an amount representing its share of project costs which was determined by multiplying the number of houses it sold during the period by a flat per-house rate. General journal entries of Development show typical amounts charged to each corporation for project costs as follows:

| Charged to | Date of journal entries made by Development | FYE | Number of houses | Total amount | Per-house rate [1] |
|---|---|---|---|---|---|
| Development [2]_____ | 10/31/62 | 10/31/62 | 12 | $54,300 | $4,525.00 |
| Properties_____ | 12/31/62 | 11/30/62 | 17 | 76,925 | 4,525.00 |
| Builders_____ | 4/1/63 | 1/31/63 | 11 | 48,675 | 4,425.00 |
| Contractors_____ | 4/30/63 | 2/28/63 | 1 | 4,425 | 4,425.00 |
| Homes_____ | 4/30/63 | 3/31/63 | 9 | 43,200 | 4,800.00 |
| Development_____ | 10/31/63 | 10/31/63 | 14 | 67,690 | 4,835.00 |
| Properties_____ | 12/31/63 | 11/30/63 | 17 | 82,195 | 4,835.00 |
| Builders_____ | 4/1/64 | 1/31/64 | 12 | 58,020 | 4,835.00 |
| Contractors_____ | 4/30/64 | 2/29/64 | 25 | 121,750 | 4,870.00 |
| Homes_____ | 5/31/64 | 3/31/64 | 15 | 76,350 | 5,090.00 |
| Development_____ | 10/31/64 | 10/31/64 | 16 | 85,520 | 5,345.00 |
| Properties_____ | 2/1/65 | 11/30/64 | 13 | 85,520 | [3] 6,578.40 |
| Builders_____ | 4/1/65 | 1/31/65 | 16 | 74,960 | 4,685.00 |
| Contractors_____ | 4/1/65 | 2/28/65 | 18 | 94,410 | 5,245.00 |
| Homes_____ | 5/31/65 | 3/31/65 | 18 | 94,410 | 5,245.00 |

[1] In those instances where the journal entries did not show the per-house rates the interpolated amount is given.
[2] Portion of project costs was retained on Development's book entries representing its share of these expenses.
[3] Officers' salaries for this year were determined on a basis of 13-home sales. However, the amount of the project cost allocation per house seems out of line and the total project cost amount more nearly coincides with 16 houses which there is some indication in the record might be the correct number.

Actual construction costs, predominantly consisting of all expenses incurred after building permits were obtained and lots were transferred to the various Colt entities, were generally paid by the appropriate Colt corporation.

General and administrative expenses, along with advertising expenses, were paid by Development and then allocated to the other Colt corporations. Included among these expenses were accounts labeled legal and accounting, auto expense, rent, office salaries, taxes-payroll, donations, promotion, dues, and subscriptions. Allocations were made per month on a percentage basis and the percentage allocated to each corporation varied from month to month.

Advertising of Burnt Mills Park and Foxhall homes appeared in the Washington Post and Washington Star newspapers. These advertisements used the words "Built by Colt," or solely identified the project with Development, and did not reveal the existence of Gerasi or the other Colt entities. Development was billed and paid for all ad costs as well as all indoor and outdoor home-display signs.

The books and records of all five Colt corporations were maintained by one bookkeeper in a single office. Each set of books identified many construction cost accounts with the same account code numbers. Of 49 construction cost accounts, 43 accounts involved payments to at least one subcontractor common to all five Colt corporations; five accounts involved payments to one subcontractor common to four Colt corporations; and one account involved payments to one subcontractor common to three Colt corporations. The Colt records show payments to other subcontractors not common to all Colt corporations, but these payments generally represent small, isolated transactions. The common subcontractors generally charged each corporation the same prices for work on the same type of house but the charges varied in accordance with the type of house being built. The styles and designs of Burnt Mills Park and Foxhall houses were rambler, split-level, or two-story configurations. The variation in style and design was necessary to fulfill an FHA requirement. There was no specialization among the five Colt corporations in constructing any particular style of house.

Sometimes, a subcontractor would execute a single subcontracting agreement with all participating Colt corporations. Another typical arrangement was that a subcontractor would simultaneously enter into separate subcontracts with each Colt corporation, using identical terms and prices. Upon occasion, a subcontractor would contract solely with Development for work on houses owned by Development and also houses owned by other Colt corporations. To obtain favorable prices for work, each Colt corporation would execute subcontracts involving a sizable number of houses. Even contracts with subcontractors who had not previously done work for any of the Colt corporations would be for work on at least 25 houses in a 100-house subdivision.

Subcontractors sometimes through error directed their billing statements to the wrong Colt corporation. When this happened, the entity receiving the bill would stamp it with a rubber stamp providing the Colt portion of the corporation's name and a blank space for designating the particular Colt entity tendering payment.

At all times here relevant, the five Colt corporations either together or separately maintained substantial and adequate liability insurance policies covering all risks arising from potential workmen's compensation claims and all other general liabilities. On February 12, 1965, their insurance broker was providing the following coverage:

(1) Workmen's compensation coverage on carpenters and/or laborers for an estimated payroll of $60,000; on clerical employees for $7,000; and on executive supervisors exercising supervision through superintendents and foremen, but no direct supervision, for $40,000. This policy covers Washington, Maryland, and Virginia.

(2) General liability coverage of $500,000/$1 million, including $25,000 property damage.

Gerasi also carried a contractor's equipment policy which covered liability insurance for various construction equipment.

The Colt corporations were additionally protected by certificates of insurance from the various subcontractors. For example, the insurance coverages carried by one of Colt's subcontractors, Contee Sand & Gravel Co., Inc., were as follows:

Comprehensive general liability—bodily injury, $500,000 each person, $1 million each accident

Comprehensive general liability—property damage, $100,000 each accident, $300,000 aggregate

Comprehensive automobile liability—bodily injury, $500,000 each person, $1 million each accident

Comprehensive automobile liability—property damage, $100,000 each accident

Most subcontractors also carried workmen's compensation coverage.

All Burnt Mills Park and Foxhall homes were sold on a commission basis exclusively through an independent real estate agency. The real estate agency uniformly used a preprinted contract form for all home sales. The contract form showed only the printed name of the real estate agency and subdivision. Upon sale of a home, petitioner, Revitz, or Sherman would execute the sales contracts and indicate the name of the appropriate Colt entity as seller.

The following schedules reflect the Colt corporations' taxable income and earned surplus and retained earnings as reported on their Federal income tax returns for the years 1959 through May 31, 1966:

TAXABLE INCOME

| Taxable year ended | Development 2/3/59 to 5/31/66 | Properties 2/15/60 to 5/31/66 | Builders 5/21/59 to 5/31/66 | Contractors 3/1/60 to 5/31/66 | Homes 6/2/59 to 5/31/66 |
|---|---|---|---|---|---|
| 10/31/59 [1] | $26,769.97 | | | | |
| 1/31/60 [1] | | | $24,505.72 | | |
| 3/31/60 [1] | | | | | $25,132.24 |
| 10/31/60 | 13,879.96 | | | | |
| 11/30/60 [1] | | $26,166.05 | | | |
| 1/31/61 | | | 17,029.55 | | |
| 2/28/61 [1] | | | | $26,780.68 | |
| 3/31/61 | | | | | 17,643.72 |
| 10/31/61 | 24,603.04 | | | | |
| 11/30/61 | | 26,556.72 | | | |
| 1/31/62 | | | (3,729.88) | | |
| 3/28/62 | | | | 20,083.99 | |
| /31/62 | | | | | 12,020.32 |
| 10/31/62 | 18,522.10 | | | | |
| 11/30/62 | | 25,914.39 | | | |
| 1/31/63 | | | 24,294.67 | | |
| 2/28/63 | | | | 8,205.62 | |
| 3/31/63 | | | | | 17,999.77 |
| 10/31/63 | 18,846.09 | | | | |
| 11/30/63 | | 26,858.17 | | | |
| 1/31/64 | | | 21,167.42 | | |
| 2/29/64 | | | | 40,009.46 | |
| 3/31/64 | | | | | 39,815.29 |
| 10/31/64 | 37,269.54 | | | | |
| 11/30/64 | | 62,181.71 | | | |
| 1/31/65 | | | 38,841.05 | | |
| 2/28/65 | | | | 67,377.45 | |
| 3/31/65 | | | | | 66,460.98 |
| 10/31/65 | 114,860.77 | | | | |
| 11/30/65 | | 78,780.90 | | | |
| 1/31/66 | | | 77,471.60 | | |
| 2/28/66 | | | | 88,355.31 | |
| 3/31/66 | | | | | 93,664.73 |
| 5/31/66 [1] | | 12.89 | | | |
| 5/31/66 [1] | | | (918.35) | | |
| 5/31/66 [1] | | | | 169.05 | |
| 5/31/66 [1] | | | | | 26,596.44 |

[1] Short periods.

EARNED SURPLUS AND RETAINED EARNINGS

| Taxable year ended | Development 2/3/59 to 10/31/65 | Properties 2/15/60 to 5/31/66 | Builders 5/21/59 to 5/31/66 | Contractors 3/1/60 to 5/31/66 | Homes 6/2/59 to 5/31/66 |
|---|---|---|---|---|---|
| 10/31/59 ¹ | $18,349.59 | | | | |
| 1/31/60 ¹ | | | $17,154.00 | | |
| 3/31/60 ¹ | | | | | $17,563.48 |
| 10/31/60 | 28,062.52 | | | | |
| 11/30/60 ¹ | | $18,059.70 | | | |
| 1/31/61 | | | 29,074.68 | | |
| 2/28/61 ¹ | | | | $18,354.71 | |
| 3/31/61 | | | | | 29,914.08 |
| 10/31/61 | 45,282.65 | | | | |
| 11/30/61 | | 36,306.93 | | | |
| 1/31/62 | | | 25,288.80 | | |
| 2/28/62 | | | | 32,413.50 | |
| 3/31/62 | | | | | 38,328.30 |
| 10/31/62 | 58,248.12 | | | | |
| 11/30/62 | | 54,245.84 | | | |
| 1/31/63 | | | 43,470.04 | | |
| 2/28/63 | | | | 38,157.43 | |
| 3/31/63 | | | | | 50,928.14 |
| 10/31/63 | 71,440.38 | | | | |
| 11/30/63 | | 72,637.76 | | | |
| 1/31/64 | | | 58,287.23 | | |
| 2/29/64 | | | | 63,238.97 | |
| 3/31/64 | | | | | 76,110.34 |
| 10/31/64 | 96,700.92 | | | | |
| 11/30/64 | | 110,496.22 | | | |
| 1/31/65 | | | 84,874.99 | | |
| 2/28/65 | | | | 104,064.70 | |
| 3/31/65 | | | | | 116,545.29 |
| 10/31/65 | 162,628.13 | | | | |
| 11/30/65 | | 157,870.95 | | | |
| 1/31/66 | | | 131,660.20 | | |
| 2/28/66 | | | | 156,509.46 | |
| 3/31/66 | | | | | 171,750.95 |
| 5/31/66 ¹ | | 157,881.00 | | | |
| 5/31/66 ¹ | | | 130,741.85 | | |
| 5/31/66 ¹ | | | | 156,641.32 | |
| 5/31/66 ¹ | | | | | 192,081.10 |

¹ Short periods.

For the following taxable years, Gerasi reported the following on its partnership returns (Forms 1065) for the calendar years indicated:

GERASI'S REPORTED INCOME AND DEDUCTIONS

| | 1960 | 1961 | 1962 | 1963 | 1964 | 1965 | 1966 |
|---|---|---|---|---|---|---|---|
| **Income:** | | | | | | | |
| Rent | $13,053.33 | $11,878.34 | $16,765.00 | $21,594.00 | $23,854.00 | $25,217.00 | $16,979.00 |
| Misc | 76.44 | 4.38 | | | | | 2,437.21 |
| Int | | | | | | | 171.44 |
| Cap. gains on lot resale | None | None | None | None | None | None | [1] 141,505.76 |
| Total | 13,129.77 | 11,882.72 | 16,765.00 | 21,594.00 | 23,854.00 | 25,217.00 | 161,093.41 |
| **Expenses:** | | | | | | | |
| Misc [2] | | 122.73 | 390.60 | 6.46 | 685.00 | 4,350.18 | 15,729.96 |
| Deprec | 8,316.03 | 3,815.94 | 12,776.48 | 15,485.52 | 12,912.37 | 9,842.06 | 13,233.01 |
| Rep. and Maint | 4,726.68 | 2,833.90 | 4,030.45 | 12,444.16 | 8,008.81 | 5,610.10 | 2,024.31 |
| Ins | 202.76 | 183.14 | 715.75 | 1,335.12 | 1,514.28 | 1,959.74 | 2,158.17 |
| Int | 9,201.85 | 15,110.58 | 19,503.40 | 12,459.27 | 5,347.79 | 13,039.51 | 3,450.41 |
| Tax (gen.) | [2] 6,176.94 | 817.76 | 639.13 | 2,320.51 | 2,121.60 | 2,667.64 | [2] 3,671.16 |
| Tax (R.E.) | | 5,349.95 | 11,151.12 | 8,448.20 | 4,580.44 | 6,379.86 | |
| Total | 28,624.26 | 28,234.00 | 49,206.93 | 52,499.24 | 35,170.29 | 43,849.09 | 40,267.02 |
| Net gain | | | | | | | 120,826.39 |
| Net (loss) | (15,494.49) | (16,351.28) | (32,441.93) | (30,905.24) | (11,316.29) | (18,632.09) | |
| To: Greenberg | (5,164.83) | (5,450.43) | (10,813.97) | (10,301.75) | (5,658.15) | (9,316.05) | 60,413.20 |
| Revitz | (5,164.83) | (5,450.43) | (10,813.99) | (10,301.74) | (5,658.14) | (9,316.04) | |
| Sherman | (5,164.83) | (5,450.43) | (10,813.97) | (10,301.75) | | | |
| Greenberg's wife | | | | | | | 60,413.19 |

| | 1962 | | 1963 | | 1964 | | 1965 | | 1966 |
|---|---|---|---|---|---|---|---|---|---|
| Invest. credit: | 10-yr. | 5-yr. | 10-yr. | 4-yr. | 10-yr. | 5-yr. | 10-yr. | 4-yr. | 8-yr. |
| To: Greenberg | $270.21 | $212.67 | $20.67 | $1,453.33 | $494.20 | $202.53 | $31.95 | $1,004.20 | $198.07 |
| Revitz | 270.21 | 212.67 | 20.66 | 1,453.34 | 494.20 | 202.53 | 31.95 | 1,004.19 | 198.07 |
| Sherman | 270.21 | 212.67 | 20.67 | 1,453.33 | | | | | |

[1] Partnership listed itself as in the business of constructing homes. Gross profit of $141,505.76 is derived from gross sales totaling $698,653 minus construction costs of $557,148.
[2] Specific allocation of taxes for the years 1960 and 1966 is unavailable.

Initially, Sherman was president of each of the five Colt corporations; Greenberg was vice president and treasurer; and Revitz was secretary.

Pursuant to a single buy-out agreement dated June 8, 1964, Sherman redeemed his shares in each Colt corporation and sold his one-third interest in Gerasi to Greenberg and Revitz. After June 8, 1964, Revitz was president of each of the five Colt corporations and Greenberg was secretary and treasurer.

Pursuant to a single agreement dated May 20, 1966, Greenberg purchased Revitz' interest in Gerasi, and Revitz redeemed his 500 shares in Development; then Greenberg and Revitz simultaneously "liquidated" Builders, Contractors, Homes, and Properties. After May 20, 1966, Greenberg was president of the then "unliquidated" Development and assumed the title of president for the

then "liquidated" Builders, Contractors, Homes, and Properties for the purpose of carrying out final postliquidation matters.

In early years each Colt entity paid officers' salaries to petitioner, Sherman, and Revitz which were authorized by separate corporate resolutions. After October 1962, general journal entries show that officers' compensation was being calculated on an identical per-house basis. Petitioner, Sherman, and Revitz were paid $1,500 per house by each Colt entity until Sherman withdrew from the business and thereafter petitioner and Revitz each received $1,700 and $2,000 per house. Development also had paid employees in addition to its officers but at no time did any of the other Colt corporations have any such employees.

Interest expense on purchase-money mortgages was paid by Gerasi and subsequently allocated to each Colt corporation by means of appropriate journal entries.

Construction financing, as well as loans to Gerasi for acquisition of the land, was provided by Interstate Building Association, H. L. Rust Co., and Suburban Trust Co. through individual mortgages on lots. These construction loans were secured by separate deeds of trust and separate insurance policies covering each house. The aggregate amount of the construction mortgage loan proceeds was disbursed among the Colt corporations weekly in a single transaction in accordance with a progress schedule. Petitioner, Sherman, and Revitz were usually required to personally endorse the mortgage notes for construction loans.

After Sherman left the business, petitioner and Revitz obtained additional operating capital through personal loans from Suburban Trust Co. On November 23, 1965, petitioner and Revitz each requested separate $300,000 1-year loans from the trust company. Revitz' loan application stated in part:

*Purpose* Loans to corporations for operating capital (Corporations will pay loans and accounts due to and from each other)

*Source of Repayment* Liquidation of 4 corporations.

*Collateral*—None—Suggest we obtain a guarantee from GREENBERG, et ux and vice versa on each $300,000 loan

*Remarks*—Will maintain compensating balances in all accounts of at least $500,000. They have ample capital now to continue construction program in FOXHALL. Twenty-eight houses under construction (twenty under roof—eight footings, fourteen sold). Forty-three lots to be built upon. Have built and sold 280 houses in subdivision. After corporations are liquidated in one year, will continue building in one corporation and the partnership.

In a later related loan application on March 8, 1966, requesting an additional $50,000, Revitz again indicated the plans to liquidate "some" of the corporations in the following 3 to 6 months.

Prior to the liquidation of the corporations, petitioner and Revitz had disagreements concerning Revitz' right to engage in various unrelated business ventures exclusive of petitioner. In order to resolve their dispute, petitioner, Revitz, and Development entered into the previously mentioned buy-out agreement on May 20, 1966, providing for Revitz' sale to petitioner of his one-half interest in Gerasi for $172,292.52; for Development's redemption of Revitz' 500 shares of stock for $118,250.61; and Revitz' resignation as an officer and director of Development. In addition petitioner and Revitz agreed to cooperate with one another in effecting the final dissolutions of Homes and Properties before March 31, 1967.

On May 24, 1966, Greenberg and Revitz caused Builders, Contractors, Homes, and Properties to adopt identical resolutions of liquidation.

Consistent with these corporate resolutions, Builders, Contractors, Homes, and Properties filed final U.S. corporate income tax returns for short tax periods ending May 31, 1966, which showed beginning balance sheets and final earnings as follows:

| Beginning balance sheets on final returns | Builders | Contractors | Homes | Properties |
|---|---|---|---|---|
| Assets: | | | | |
| Cash | $163,299.49 | $172,119.69 | $161,361.02 | $1,440.68 |
| Notes and accounts receivable | 21,238.57 | 14,150.80 | 20,666.46 | 185,877.35 |
| Inventory | | | 26,531.81 | |
| Buildings, other fixed assets | 2,699.04 | | | |
| | 187,237.10 | 186,270.49 | 208,559.29 | 187,318.03 |
| Treasury stock | ? | 22,079.69 | 26,336.78 | 25,213.00 |
| | | 208,350.18 | 234,896.07 | 212,531.03 |
| Liabilities: | | | | |
| Accounts payable | 7,598.53 | | 5,380.22 | 3,501.06 |
| Current liabilities | | | 1,500.00 | |
| Mortgages, notes, bonds (over 1 year) | 10,214.53 | 40,560.83 | 9,876.11 | 12,606.49 |
| Other liabilities/accrued taxes | 34,763.84 | 8,279.89 | 43,388.79 | 35,552.53 |
| | 52,576.90 | 48,840.72 | 60,145.12 | 51,660.08 |
| Equity: | | | | |
| Paid-in capital | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 |
| Earned surplus | 131,660.20 | 156,509.46 | 171,750.95 | 157,870.95 |
| | 187,237.10 | 208,350.18 | 234,896.07 | 212,531.03 |
| Final reported earned surplus | 133,741.85 | 159,641.32 | 195,081.10 | 160,881.00 |
| Less: Treasury stock from Sherman redemption | 20,429.08 | 22,079.69 | 26,336.78 | 25,213.00 |
| Adjusted final earned surplus | 113,312.77 | 137,561.63 | 168,744.32 | 135,668.00 |
| ½ adjusted final earned surplus | 56,656.38 | 68,780.81 | 84,372.16 | 67,834.0 |

Consistent with the May 24, 1966, separate resolutions, information returns were filed, showing the following distributions as of May 31, 1966:

| | Builders | Contractors | Properties |
|---|---|---|---|
| Cash: | | | |
| To Greenberg | $481.70 | $77,321.21 | $7,836.89 |
| To Revitz | 481.70 | 77,321.20 | 7,836.88 |
| Total | 963.40 | 154,642.41 | 15,673.77 |
| Notes and accounts receivable: | | | |
| To Greenberg | 54,078.43 | (8,540.39) | 59,997.11 |
| To Revitz | 56,174.69 | (8,540.39) | 59,997.12 |
| Total | 110,253.12 | (17,080.78) | 119,994.23 |
| Equipment: | | | |
| To Greenberg | 2,096.25 | | |
| To Revitz | | | |
| Total | 2,096.25 | | |
| Grand total | 113,312.77 | 137,561.63 | 135,668.00 |
| Greenberg's total share | 56,656.38 | 68,780.82 | 67,834.00 |
| Revitz' total share | 56,656.39 | 68,780.81 | 67,834.00 |
| Total | 113,312.77 | 137,561.63 | 135,668.00 |

After the "liquidations" Development continued to construct and sell houses in Foxhall and subsequently in other areas of Montgomery County, Md. Gerasi began participating along with Development in the sale of Foxhall homes in 1966 and 1967.

After completion of the Foxhall subdivision, Development and Gerasi began building homes in Stonegate subdivision. Gerasi acquired at least 62 lots in Stonegate. Development entered into agreements with subcontractors for the construction of Stonegate homes as early as September 1966.

Development presently maintains an address in Stonegate, Silver Spring, Md. The Stonegate subdivision includes Crimson Oaks, the first part of which Development built. The remaining houses in Crimson Oaks were built by petitioner's wholly owned and unincorporated Raymond Greenberg Construction Co. Development is also constructing homes in the 120-house Peachwood subdivision. In Peachwood, Development contracts to build houses for another partnership of which Greenberg is part owner.

With respect to the distributions received from Builders, Contractors, Homes, and Properties, Greenberg reported the following on his 1966 joint Federal income tax return:

| | Total | Builders | Contractors | Homes | Properties |
|---|---|---|---|---|---|
| Amount realized | | $42,367.03 | $52,860.60 | $68,134.32 | $54,632.58 |
| Cost of stock | | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| Gain realized | $213,994.53 | 41,367.03 | 51,860.60 | 67,134.32 | 53,632.58 |
| Less: Claimed sec. 1202 deduction | 106,997.27 | | | | |
| Net gain reported | 106,997.26 | | | | |

Respondent in his notice of deficiency determined that the amounts reported by petitioner as capital gains received in exchange for his stock in fact constituted ordinary income and disallowed Greenberg's claimed section 1202 deduction.

#### ULTIMATE FINDINGS OF FACT

The four "liquidated" Colt corporations lacked any separate or independent business purpose apart from the unliquidated Development, whose inseparate and common building business was not terminated or otherwise interrupted by the four "liquidations."

The earnings and profits of the four "liquidated" Colt corporations were solely derived from the earnings and profits of a single business comprised of the five Colt corporations which business was not terminated nor otherwise interrupted by the four Colt corporations' "liquidations."

#### OPINION

Although at the trial petitioner's objection to the introduction of certain evidence on the ground that it was obtained by respondent's agent Zoslow prior to the trial of this case in violation of section 7605 (b), I.R.C. 1954,[1] was overruled, petitioner on brief argues that we should reconsider this ruling and disregard this evidence. This evidence consists of parts of records which respondent subpoenaed from petitioner. Petitioner could have brought the requested records to court. Instead, "because of the scope and amount of material involved," he chose to allow respondent's agent Zoslow access to seven file cabinets from which to obtain information or copies from those books and records requested in the subpoenas duces tecum for use at the trial. Zoslow's review of petitioner's files was with the permission of petitioner who chose not to ferret out the requested records by himself and in effect requested that the agent go over the subpoenaed records to relieve him of the trouble of bringing them to court. Section 7605(b) is not directed to circumstances such as here presented and none of the cases relied on by petitioner bear any factual resemblance to the facts here present. We will therefore not reconsider our ruling at the trial admitting evidence obtained as a result of Zoslow's inspection of subpoenaed records.

---

[1] All references are to the Internal Revenue Code of 1954, unless otherwise noted.
SEC. 7605. TIME AND PLACE OF EXAMINATION.
(b) RESTRICTIONS ON EXAMINATION OF TAXPAYER.—No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.

Respondent takes the position that distributions made to petitioner allegedly in liquidation of four of the five Colt corporations do not qualify for capital gains treatment, since the formal dissolution of Homes, Builders, Contractors, and Properties did not interrupt or terminate petitioner's single integrated business enterprise of constructing residential subdivisions. Respondent bases his argument primarily on the contention that the multiple corporations were shams, that there was no real independent business purpose in their separate creation and utilization, and that throughout the existence of all the Colt corporations in substance all income from the development and sale of property was earned by Development which continued in existence when the other corporations were liquidated. Respondent contends therefore that the distributions made to petitioner should not be considered liquidating distributions in exchange for petitioner's entire stock interest under section 331(a)(1)[2] because petitioner still holds 500 shares of Development which has not ceased doing business, and that the amounts paid to petitioner are distributions of earnings and profits of an ongoing enterprise, taxable as ordinary income.

In the alternative, if we find that the four Colt corporations were not shams, respondent contends that capital gain treatment provided under section 331 must be disallowed because petitioner, along with Revitz and Sherman, acquired control of the Colt corporations for the principal purpose of the "evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy." Sec. 269(a)(2).

We have faced the issue of the shamness of multiple corporations previously in *Aldon Homes, Inc.*, 33 T.C. 582 (1959), upon which respondent relies, and *Shaw Construction Co.*, 35 T.C. 1102 (1961). Although there are slight gradations of tone and minor variations in texture, the facts and evidence in this case paint a picture which in essence is the same as the *Aldon* and *Shaw* cases. In *Aldon*, we found that the multiple corporations lacked any substantial business purpose for organization as such and that none of the corporations engaged in any independent substantive business activities. Therefore, we did not recognize their separateness for tax purposes and under section 22(a), I.R.C. 1939, attributed their entire net income to one corporate taxpayer.

In *Shaw*, we again upheld respondent's attribution of all income derived from the development and sale of residential property to the

---

[2] SEC. 331. GAIN OR LOSS TO SHAREHOLDERS IN CORPORATE LIQUIDATIONS.

(a) GENERAL RULE.—

(1) COMPLETE LIQUIDATIONS.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock.

taxpayer, Shaw Construction Co., based on our finding that "the multiple corporations * * * were shams, existing in name only, serving no business purpose and in reality performing no business or other functions." We consider respondent's position in the case at bar to be squarely supported by both these cases.

As we recognized in *Aldon* and *Shaw*, taxpayers are entitled to cast their business transactions so as to minimize their tax liability. *Gregory* v. *Helvering*, 293 U.S. 465 (1935); *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950). At the same time, the Government may challenge and disregard the form so chosen if it is unreal or a sham. As stated in *Moline Properties* v. *Commissioner*, 319 U.S. 436, 439 (1943), so long as the purpose of a corporation "is the equivalent of business activity or is followed by the carrying on of business by the corporation" it remains a separate entity, but "in matters relating to the revenue, the corporate form may be disregarded where it is a sham or unreal. In such situations the form is a bald and mischievous fiction."

We have considered the evidence both documentary and testimonial in the record before us, and conclude that the Colt entities, other than Development, were not organized for any business purpose and did not engage in any business separate from Development. These corporations served no purpose except to obtain a tax benefit which is not "business" sufficient to grant them recognition as separate "tax-worthy" entities for Federal tax purposes. *National Investors Corporation* v. *Hoey*, 144 F. 2d 466, 468 (C.A. 2, 1944); *Aldon Homes, Inc., supra* at 597.

Petitioner contends that the five corporations were separate entities which took title to the property, arranged for improvements to lots, paid for construction and arranged the sale of homes thereon, and that use of five corporations instead of one was necessary to limit liability. Petitioner further contends that there is no evidence that he and his associates acquired control of the five Colt corporations for the principal purpose of evading or avoiding taxes, and that "even if there were such evidence, the proposed disallowance of the capital gain credit is clearly unauthorized by" section 269.

Finally, petitioner argues that, even if respondent can successfully show a lack of business purpose during the existence of a corporation, this does not preclude the applicability of section 331, "provided that the distribution in liquidation was made by a corporation having separate legal existence."

With regard to petitioner's primary contention, we do not consider the nominally separate activities of the Colt entities to reflect the operation of five independent businesses. It is clear from the evidence

in the record that petitioner and his associates, either through Gerasi or Development, performed all work necessary to the development and sale of homes in Burnt Mills Park and Foxhall. The evidence shows that Homes, Builders, Contractors, and Properties were no more than shells. These "corporations" had no employees or assets, shared offices, officers, and directors, and did not do any business unless they could be considered to be doing business in the development of the two subdivisions, Burnt Mills Park and Foxhall, which in our view in substance they cannot. The actual development activities were planned and carried out as part of a single integrated venture, with no attempt to distinguish between the Colt entities. The organization of more than a single corporation added nothing to the enterprise and caused unnecessary duplication of bookkeeping and other activities. Petitioner justifies this wasteful duplication of activities by claiming that management feared tort and other liability inherent in developing a subdivision of such substantial size. Petitioner cites *Southern Dredging Corp.*, 54 T.C. 705 (1970), to illustrate that a business purpose of limiting liability warrants the creation and recognition of several corporations, despite identical ownership and management and similar business activities. In *Southern Dredging*, two brothers operating a partnership decided to organize four corporations, one of which leased and operated three dredges, each dredge being owned by a separate corporation. The formation of separate entities was precipitated by the expansion of operations into more hazardous dredging operations in inland waterways. We recognized the presence of a valid business purpose of insulating one corporation's assets against the others' liabilities in this hazardous activity. We stated that the fact that all four corporations shared the same offices, address, telephone, repair service, and management and had all their bookkeeping performed by one individual did "not detract from the validity of having separate corporations for the realistic purpose of limiting liability." *Southern Dredging Corp., supra* at 721. We also noted that the formation of separate entities was further motivated by the fact that a prerequisite to the sale of a former part owner's share of the business to the remaining owners was that they form separate corporations to protect his creditor's interest, a precaution readily understood in light of the fact that marine and liability insurance available was insufficient to eliminate the substantial tort risk involved. The circumstances in that case do not equate to the situation before us here. Petitioner's business is less hazardous and unpredictable than that of the taxpayer in *Southern Dredging Corp., supra.* Tort risk in petitioner's business is not of such magnitude so that a single claim might exceed insurance coverage and jeopardize the well-being of the entire enterprise. Petitioner's business was adequately protected by insurance.

The hazards which the Colt entities faced in their construction business were similar to those encountered by the taxpayers in *Aldon* and *Shaw*. In each of those cases we rejected arguments that the need to limit various types of liability justified having multiple corporations. We reject these same contentions raised by petitioner. As we said in *Aldon Homes, Inc., supra* at 598–599:

There was little or no demonstration as to how they would operate to the economic benefit of Aldon or the alphabet corporations. Particularly is this true of the purpose to avoid the possibility of a "general claim" against the total project. We are left to surmise what the nature of such a claim might be with little to stimulate our imagination in this respect, except the reference to a suit resulting from an accident in the development of another tract. This, however, would appear to fall under the limitation of tort liability purpose. The benefits to be derived in this area from the use of multiple corporations are likewise unclear, particularly in view of the known custom of construction companies, as well as most businesses, to carry liability insurance, and the operation of workmen's compensation laws. The income tax returns filed by the alphabet corporations wherein deductions were claimed by each, in substantially the same amounts, for both "General" and "Workmen's Compensation" insurance, indicate they were fully protected in both respects. The stockholders already had the benefit of a "corporate shield" in Aldon, and on the evidence shown, the seeking of additional insulation through the formation of 16 more "corporate shields" was at best of minimal business significance. * * *

We also see little merit in the contention that the use of multiple corporations was necessary to facilitate the handling of mechanics' liens. As a general rule mechanics' as well as materialmen's liens, are related in time of filing and in liability to the particular building or improvement for which they are furnished, though this may be and frequently is changed by the contract or arrangement under which they are supplied. See 36 Am. Jur., Mechanics' Liens, secs. 167–175. Here the houses were built on a mass production basis, that is, construction was initiated on lots in the first block of the subdivision and progressed lot by lot up and down the streets until the entire tract was completed. Workers moved from house to house as their phase of the work was ready to be done. Presumably materialmen's and mechanics' liens attached to the houses as completed and it is not made clear to us how the use of multiple corporations would "ease the handling of mechanics' liens" to any greater extent. * * * The recited purpose relating to the handling of mechanics' liens, as in the case of the first two enumerated purposes, was but a "make weight" factor secondary to the parties' primary objective of avoiding taxes.

Sherman testified that he regarded the multiple corporate structure as vital to avoid potential problems with subcontractors. Although his testimony is unclear, we assume that he was referring to such problems as shoddy workmanship or a subcontractor's failure to perform work on schedule. However, he did not explain why problems such as these could not just as easily be minimized by a single corporation which could limit the amount of work given to any single contractor. Instead, more often than not, each Colt corporation contracted with the same subcontractors to perform a major part of the work throughout the entire development. Such practice is not consistent with the purported fear of problems with subcontractors.

Petitioner raised the proposition that the use of multiple corporations might minimize the financial risks of building a residential development of the magnitude of Burnt Mills Park or Foxhall but did not explain how this result would be attained. Since the Colt corporations built homes of the same style and price in the same development, unfavorable market conditions would most likely affect all five corporations in the same manner. In addition, petitioner, Revitz, and Sherman gave personal guarantees on construction and purchase-money loans on behalf of all five corporations, so that any claim arising from financial failure of a single Colt entity would necessarily have direct financial repercussions on all Colt entities. We find that this contention lacks merit.

It is not clear that the financial risks of the enterprise were ever really transferred to the Colt entities, since there is no evidence to show that the Colt entities assumed total liability for the purchase price of the Burnt Mills Park and Foxhall tracts. As the findings of fact reflect, Gerasi financed the purchase of the tracts and, as far as the record shows, remained primarily liable not only on second mortgages in favor of the banks but also on first mortgages issued to the respective sellers. When the lots were transferred to or through Development to the other Colt entities, no funds were transferred to Gerasi as payment. Rather, the purchase price of the lot was simply shown in corresponding journal entries as an open account indebtedness until the lot was sold, at which time the respective Colt corporation would pay the portion of the sales price to obtain release of the seller's underlying purchase-money lien and, presumably, apply the balance to the amount owed to Gerasi. Since the brunt of liability remained on Gerasi, petitioner's multiple corporate structure did not alleviate this particular aspect of financial risk at all.

Anticipating our conclusion that the Colt entities were shams for tax purposes, petitioner submits that a finding of shamness and lack of business purpose of a liquidating corporation would not preclude the applicability of section 331, "provided that the distribution in liquidation was made by a corporation having separate legal existence." Petitioner does not refer us to any statute or case law to support this proposition.[3] Contrary to petitioner's position, applica-

---

[3] We have found no case specifically involving this issue. In the case of *Walter L. Morgan*, 33 T.C. 30 (1959), reversed on another issue 288 F. 2d 676 (C.A. 3, 1961), we held that assets of one corporation could not be allocated to another corporation under sec. 45, I.R.C. 1939 (now sec. 482, I.R.C. 1954), and concluded that a taxpayer was entitled to report gain on the liquidation of a corporation the gross income and deductions of which had been allocated to another corporation as capital gain. The respondent acquiesced in this holding and it was not involved in the appeal. In our view the *Morgan* case is distinguishable from the instant case both on its facts, the second liquidated corporation having had its income and deductions allocated to the corporation we held in the first issue to have been also properly liquidated, and as a matter of law, since our holding there related solely to the application of sec. 45, I.R.C. 1939, to the liquidation of a corporation.

tion of the "sham doctrine" to the case at bar logically precludes a finding that the transactions structured as liquidations under section 331 were in fact liquidations. To explain the impact of a finding of shamness, once we determine that the five Colt entities are in reality a single corporation, we attribute all earnings from sales of homes in Burnt Mills Park and Foxhall subdivisions to the single enterprise. Since this enterprise still exists as Development and continues to carry out the business of developing residential subdivisions under the Colt name, the distributions made by it cannot qualify for treatment under section 331 within the plain wording of the statute.

If the entire transactions in the formation and use of the corporations other than Development are ignored for lack of substance, then all that has occurred here is that Development has distributed its earnings and profits to its shareholder, petitioner. It follows that this distribution is a dividend to petitioner. In our view this is the proper conclusion as to the substance of what occurred under the facts here present.[4] The only other view that might be taken of the substance of the transaction is that petitioner's acquisition of "stock" in the other Colt corporations was in substance acquisitions of additional stock in Development, and in substance petitioner received earnings and profits of the corporation in redemption of a part of his stock in the corporate enterprise so that tax treatment of the distributions would be governed by section 302.[5]

---

[4] Petitioner makes no argument that in fact this is not the proper conclusion if we hold the Colt corporations other than Development were shams and that sec. 331 does not automatically apply to any corporation which has a legal existence under State law. Petitioner does not argue that if we hold the Colt corporations other than Development to be shams we should consider whether the purported liquidations of these corporations should be viewed as a partial liquidation of Colt and the facts in the records are not sufficient to make such a determination.

[5] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

(1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

(2) SUBSTANTIALLY DISPROPORTIONATE REDEMPTION OF STOCK.—

(A) IN GENERAL.—Subsection (a) shall apply if the distribution is substantially disproportionate with respect to the shareholder.

(B) LIMITATION.—This paragraph shall not apply unless immediately after the redemption the shareholder owns less than 50 percent of the total combined voting power of all classes of stock entitled to vote.

(C) DEFINITIONS.—For purposes of this paragraph, the distribution is substantially disproportionate if—

(i) the ratio which the voting stock of the corporation owned by the shareholder immediately after the redemption bears to all of the voting stock of the corporation at such time,

is less than 80 percent of—

(ii) the ratio which the voting stock of the corporation owned by the shareholder immediately before the redemption bears to all of the voting stock of the corporation at such time.

For purposes of this paragraph, no distribution shall be treated as substantially dis-

Section 302(a) allows exchange treatment, and concommitant capital gains on certain categories of redemptions outlined in section 302 (b). Failure to qualify under one of the four categories set forth in section 302(b) results in amounts paid being treated as distributions of property under section 302(d) which, in conjunction with sections 301 and 316, causes the distribution to be ordinary income.

Section 302(b)(4) obviously does not apply in this case since that subsection is limited to certain railroad corporations.

Since petitioner has not terminated his interest in the Colt enterprise, he does not qualify under section 302(b)(3) for exchange treatment. Nor does the transaction fit within the confines of section 302 (b)(2) which defines substantially disproportionate redemptions of stock. This leaves for our consideration section 302(b)(1) which permits capital gain treatment if the redemption is not essentially equivalent to a dividend.

The determination of whether a distribution is essentially equivalent to a dividend generally depends upon the facts and circumstances of each case, but in *United States* v. *Davis*, 397 U.S. 301 (1970), the Court stated that when a sole stockholder causes a part of his shares to be redeemed the "redemption is always 'essentially equivalent to a dividend' within the meaning of that phrase in section 302(b)(1)." In that case the Court further stated (p. 313) :

If a corporation distributes property as a simple dividend, the effect is to transfer the property from the company to its shareholders without a change in the relative economic interests or rights of the stockholders. Where a redemption has that same effect, it cannot be said to have satisfied the "not essentially equivalent to a dividend" requirement of § 302(b)(1). Rather, to qualify for preferred treatment under that section, a redemption must result in a meaningful *reduc-*

proportionate unless the shareholder's ownership of the common stock of the corporation (whether voting or nonvoting) after and before redemption also meets the 80 percent requirement of the preceding sentence. For purposes of the preceding sentence, if there is more than one class of common stock, the determinations shall be made by reference to fair market value.

(D) SERIES OF REDEMPTIONS.—This paragraph shall not apply to any redemption made pursuant to a plan the purpose or effect of which is a series of redemptions resulting in a distribution which (in the aggregate) is not substantially disproportionate with respect to the shareholder.

(3) TERMINATION OF SHAREHOLDER'S INTEREST.—Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.

(4) STOCK ISSUED BY RAILROAD CORPORATIONS IN CERTAIN REORGANIZATIONS.—Subsection (a) shall apply if the redemption is of stock issued by a railroad corporation (as defined in section 77(m) of the Bankruptcy Act, as amended) pursuant to a plan of reorganization under section 77 of the Bankruptcy Act.

\*     \*     \*     \*     \*     \*     \*

(d) REDEMPTIONS TREATED AS DISTRIBUTIONS OF PROPERTY.—Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies.

*tion* of the shareholder's *proportionate interest* in the corporation. * * * [Emphasis supplied.]

Clearly, the petitioner's redemption of part of his stock in the Colt enterprises would not qualify under the holding in *Davis* since it would not be not essentially equivalent to a dividend. After the redemption, petitioner was the sole shareholder in the Colt enterprise. Therefore if the distribution to petitioner is viewed as a redemption of part of his stock in the Colt enterprise, section 302(d)' imposes ordinary income treatment on amounts distributed to petitioner.

Because certain issues have been disposed of by agreement of the parties,

*Decision will be entered until Rule 155.*